IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2011

## STATE OF TENNESSEE v. MONTE HULL

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-06874      W. Mark Ward, Judge**

---

**No. W2010-02322-CCA-R3-CD  - Filed May 16, 2012**

---

A Shelby County Grand Jury returned an indictment against Defendant, Monte Hull, and Co-Defendant, Johnny Williams, charging them with aggravated robbery. Following a consolidated jury trial, Defendant and Co-Defendant Williams were convicted of the offense. However, Co-Defendant Williams is not part of this appeal. Defendant received a sentence of eight years in the Department of Correction.  On appeal, Defendant argues that the evidence was insufficient to support his conviction.  After a thorough review, we affirm the judgment  of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, PJ., and NORMA MCGEE OGLE, J., joined.

Neil Umsted, Memphis, Tennessee, for the appellant, Monte Hull.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Neal Oldham, Assistant District Attorney General; for the appellee, the State of Tennessee

### OPINION

## I. Background

On February 19, 2008, Yvonnie Johnson was working at the Mapco located at Park Avenue and Airways Boulevard in Memphis with her manager, Co-Defendant Johnny Williams.  At approximately 12:20 p.m., Ms. Johnson was in the process of performing a "drop" from her register, which she explained meant putting money in excess of fifty dollars

into the safe located behind the register, when Co-Defendant Williams called her over to look at an envelope that had been on his desk. Prior to that moment, Co-Defendant Williams had been outside. Ms. Johnson left the money that she had been counting on the counter near the safe. As Co-Defendant Williams asked her a question, a man walked into the store wearing a "brown tannish [hooded] coat with black in it." He also had a small silver gun. The man then told Ms. Johnson and Co-Defendant Williams to get behind Co-Defendant Williams' desk, and the man asked, "[W]here [sic] the money at?" Ms. Johnson thought that he was referring to the money that she had laid by the safe, and she pointed in that direction. Co-Defendant Williams also pointed and said, "It's over there man." Ms. Johnson saw the man grab the money that she had been counting. He grabbed something else that appeared to be a plastic bag next to the safe, and he then left the store.

Ms. Johnson asked to go to the restroom but Co-Defendant Williams told her not to leave because he had to call the area manager. She thought that he called the area manager and then pulled the two-dollar bill from the clip in the cash register to activate an alarm to summon police. Ms. Johnson testified that store procedure was to pull the money from the clip and then call the area manager. Co-Defendant Williams then told Ms. Johnson that the man had taken all of the money that he had counted and had bagged up for the day.

Ms. Johnson admitted at trial that she was unable to identify Defendant as the man who robbed the store. She explained that she was scared during the robbery and stopped looking at him. Ms. Johnson told police that the man had a dark complexion. She also testified that after viewing the video, she realized that the man had been in the store earlier that same day before the robbery. Ms. Johnson also told police that she could not identify the man. She testified that she could not identify anyone in the first photographic display that was shown to her by police on February 26, 2008. Ms. Johnson testified that she was shown a second photographic display on May 8, 2008, at her home. She identified a picture of Defendant as "the guy that robbed me at the Mapco." She also signed and dated the picture. She said that she told police that the picture of Defendant looked like the man who robbed the Mapco. She also testified that the man who robbed the store held the gun in his right hand. Ms. Johnson added that she meant that Defendant looked more like the perpetrator than the others pictured, but that Defendant as not necessarily the robber.

Karen Gray was working as a district manager for ten Mapco locations in February of 2008. On February 19, 2008, she received a call from Co-Defendant Williams indicating that the store at Park Avenue and Airways Boulevard had been robbed. Ms. Gray performed an audit and determined that approximately $9,000 was missing. Co-Defendant Williams said that a "guy" came in and took the money. Ms. Gray viewed the video of the robbery and wrote out a statement. On the video, she saw Co-Defendant Williams counting receipts from the previous day. She said that no money should have been sitting on the counter, and

Co-Defendant Williams should have never left money unattended. Ms. Gray testified that after the money was counted, Co-Defendant Williams should have put it back in the safe by using tubes that allowed small amounts of money to be dropped into the safe, or by opening the safe and storing the money inside. She also explained that the safe was on a time delay and would take seven minutes to open after the combination had been entered. From her review of the video, Ms. Gray testified that Co-Defendant Williams violated store policy by leaving money sitting on the counter under a clipboard. Ms. Gray testified that after a robbery, store policy was that the alarm should immediately be pulled to alert police, and then the district manager should be notified to secure the store.

Detective Tony Parks of the Memphis Police Department investigated the robbery. He testified that a fingerprint lifted from the scene was identified as belonging to someone named Kenneth Vaughn. He then showed a photographic line-up with Mr. Vaughn's picture in it to Ms. Johnson but she did not identify anyone. Mr. Vaughn was therefore eliminated as a suspect.

Detective Parks studied the surveillance tapes and was suspicious that the robbery was an "inside job" because it was unusual for a Mapco to have $9,000 in the store. He noticed that Co-Defendant Williams was constantly on the phone around the time of the robbery. He called and requested Co-Defendant Williams' cell phone records from the two days before through two days after the robbery. He also called and spoke with Ms. Gray about store procedures. On the day of the robbery, the phone records reflected fifteen conversations between the phone belonging to Co-Defendant Williams and the phone belonging to Defendant. The calls began at 10:52 a.m. on February 19, 2008, and ended that day at 6:53 p.m. There were also five attempted calls between 11:35 a.m. and 12:24 p.m. The records did not reflect any calls between the two phones the day after the robbery.

Detective Parks obtained a copy of Defendant's driver's license photo and put together a second photographic line-up and showed it to Ms. Johnson on May 8, 2008. Ms. Johnson looked at the line-up for four or five seconds, pointed to Defendant's photograph, and said, "This is the guy that robbed me. This looks like him." She also circled Defendant's picture and wrote, "This is the guy that robbed me at the Mapco."

Detective Parks matched calls from Co-Defendant Williams' phone records to calls seen on the surveillance video. He testified that at 12:09 p.m., Co-Defendant Williams could be heard on the videotape saying "[N]ow, now, Monte, come on now." Detective Parks said that he could also see Co-Defendant Williams count money, put it in a bag, and then place it in a plastic "customer bag." However, he said that Co-Defendant Williams denied placing the money in a plastic bag, even though he viewed the video with Detective Parks. On the video, Detective Parks noticed a small blue car in the parking lot. He explained that the car

entered the area at approximately 12:20 p.m., prior to the robbery, and it left the area traveling south on Airways Boulevard after the robbery. Detective Parks testified that Co-Defendant Williams told police that the car left the area going in the opposite direction, down Park Avenue. After viewing the video, Co-Defendant Williams was shocked that the car drove down Airways Boulevard. Detective Parks testified that by using an almanac, he determined that February 19, 2008, was on a Tuesday, and the weather in Memphis, Tennessee and West Helena, Arkansas was mild with a temperature of forty to fifty degrees Fahrenheit.

Co-defendant Williams testified that he did not rob the Mapco or help plan the robbery. He admitted that it was not within store policy to leave the money that he was counting on the counter instead of in the safe. It was also inappropriate for Ms. Johnson to leave some of the "drop" money on the counter.

Co-defendant Williams explained that on the day of the robbery, his family had planned a fish fry for his mother at Storm Creek Park in West Helena, Arkansas. He said that he spoke with his brother, Samuel Williams, and his nephew, Defendant, early that morning to say that he would not be able to make it to the fish fry because of work. He also asked Defendant to do the cooking. Co-defendant Williams testified that someone was supposed to go by his house in West Helena to pick up equipment for the fish fry.

Co-Defendant Williams testified that on the day of the robbery, he received several phone calls from his nephew, Fred Davidson, who was using Defendant's cell phone. Co-Defendant Williams explained that he originally thought that Defendant was driving to Memphis to meet him and get money to buy items for the event. However, Mr. Davidson and his mother, Sara Murrell, drove to Memphis instead. Co-Defendant Williams said that he spoke with Mr. Davidson about items to get for the fish fry, and he also gave Mr. Davidson directions to the Mapco. He said that Mr. Davidson initially drove to the wrong Mapco, and he then gave Mr. Davidson directions to the correct store.

Co-Defendant Williams testified that he did not remember dialing Defendant's phone immediately after the robbery but said that he may have dialed it by mistake. He said that he pulled the alarm after the robbery to notify police, and he called the district manager. Co-Defendant Williams did not believe that the man who robbed the store came in earlier as Ms. Johnson testified. He said that he did not intentionally leave money on the counter, and when the gunman asked for the money, he was actually pointing to the money that Ms. Johnson left on the counter, not the money that he had been counting. Co-Defendant Williams testified that he did not place the money that he left on the counter down in a plastic bag. He claimed that he had placed a bag over the money while he waited on a customer. He admitted that the video showed him standing up from the desk and picking up the money that he had been

validating. Co-Defendant Williams said that the money had been validated, but it was not in a deposit bag when he sat it on the counter. He said that he made a mistake and did not put the money in the safe after the customer left. Co-Defendant Williams testified that he took out the trash before the robbery, and he was distracted and left the money on the counter.

Co-Defendant Williams testified that when he went outside, there were two ladies in a small blue car. He acknowledged that the surveillance video showed a small blue car pulling up at approximately 12:20 p.m., shortly before the robbery, and ten seconds after he walked in the door. He further acknowledged the car was similar to a blue car that pulled up at the store earlier that day, and a man got out that Ms. Johnson said looked like the man who robbed the store. Co-Defendant Williams testified that he did not see in which direction the car left. He admitted that he told police that the car drove down Park Avenue; however, he said that he should have told police that the car turned on Airways Boulevard and then Park Avenue. Co-Defendant Williams testified that he called Defendant's cell phone after the robbery to let Mr. Davidson and Ms. Murrell know what happened. He said that he continued talking to family members after the robbery about what to buy for the fish fry.

In a phone conversation around 12:07 p.m., Co-Defendant Williams asked the person to give him a few more minutes. He felt that they could have been talking about anything. He did not deny saying "now, now, Monte, come on now." He claimed that he accidently called Mr. Davidson by the wrong name. Co-Defendant Williams testified that he was indicating to Mr. Davidson that he could talk at that point. He said that he immediately hung up the phone because he thought the connection was bad.

Co-Defendant Williams testified that he was discussing an envelope containing cigarette prices with Ms. Johnson when the robber walked in. However, the conversation was not picked up by the microphone. Co-Defendant Williams admitted that the robbery occurred within a matter of seconds of him walking back inside the store, and the robber came from the same direction that he had been. He also admitted that the robber did not stop to put the large amount of money in a bag but grabbed everything with one swift motion. Co-Defendant Williams agreed that the robber came in the store a few minutes after he left the money on the counter and after he said, "come now, Monte, come now."

Fred Davidson and his mother, Sara Murrell, who is Co-Defendant Williams' sister, testified that they drove from West Helena, Arkansas, to Memphis on February 19, 2008, to buy supplies at Sam's Club for a family fish fry. Mr. Davidson testified that earlier that morning, he and Defendant, his cousin, had driven to Co-Defendant Williams' house to pick up some equipment for the event. He said that he then borrowed Defendant's cell phone because he and his mother did not have one. Mr. Davidson testified that he talked to Co-

Defendant Williams on Defendant's phone about directions to the Mapco and supplies for the fish fry. He thought that Co-Defendant Williams was waiting outside the store when he and his mother arrived at approximately 10:30 a.m. Co-Defendant Williams then gave him $60-$70 to buy supplies.

Mr. Davidson and Ms. Murrell testified that they left Memphis and drove back to Storm Creek Park. Defendant was there when they arrived between 2:00 and 3:00 p.m., and Mr. Davidson then returned the cell phone to him. Mr. Davidson testified that Co-Defendant Williams called him "Monte" once while they were talking. He did not recall what he and Co-Defendant Williams discussed during the call around 1:30 or 2:00 p.m. Mr. Davidson admitted that he never contacted the Memphis Police Department to tell them that he had Defendant's phone on the day of the robbery. Ms. Murrell testified that she learned about the robbery from Co-Defendant Willliams' wife.

Mary Martin, Co-Defendant Williams' sister and Defendant's aunt, testified that Defendant was at Storm Creek Park cooking when she arrived at approximately 3:30 p.m. She said that the weather was cool, and to her knowledge, Defendant did not leave the park. She learned of the robbery around 2:00 p.m. from Co-Defendant Williams' wife.

Mary Hunter, Defendant's mother and Co-Defendant Williams' sister, testified that she and Defendant arrived at Storm Creek Park at approximately 9:00 a.m. on February 19, 2008, in Defendant's blue 1994 Chevrolet Caprice. She said that Defendant left the park once with Mr. Davidson to pick up equipment at Co-Defendant Williams' house. Ms. Hunter testified that Defendant allowed Mr. Davidson and Ms. Murrell to use his cell phone. She said that Defendant was left-handed, and he did not own a brown hooded jacket. Ms. Hunter testified that Defendant left the park with her that evening, and they were "[n]ear the last" to leave.

Defendant testified that he spent the night with his uncle, Samuel Williams, and on the morning of February 19, 2008, he and Mr. Williams spoke with Co-Defendant Williams. Co-Defendant Williams indicated that he wanted Defendant to cook for him at the fish fry. Defendant testified that he left Mr. Williams' house at approximately 8:15 to 8:30 a.m. and drove to Storm Creek Park. He said that Mr. Davidson and Ms. Murrell arrived a few minutes later and that he and Mr. Davidson drove to Co-Defendant Williams' house a few blocks away to pick up some equipment. Defendant testified that Mr. Davidson and Ms. Murrell then drove to Sam's Club in Memphis and that he let them borrow his "Go-phone." He said that Mr. Davidson and Ms. Murrell arrived back at the park at approximately 3:00 p.m., and he left the park between 6:00 and 6:30 p.m.

Defendant testified that he was left-handed and was sixteen years old in the driver's license photo used in the line-up. He said that he wore his hair in an "Afro" at the time. Defendant testified that he was eighteen or nineteen years old at the time of the robbery and wore his hair in dread locks. He did not hear Co-Defendant Williams on the video tell police that the robber had dread locks.

## II. Analysis

Defendant argues that the evidence presented at trial was insufficient to support his aggravated robbery conviction. More specifically, he asserts that the proof was insufficient to prove his identity as the perpetrator of the offense.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. *See State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See Evans*, 108 S.W.3d at 236-37; *Carruthers*, 35 S.W.3d at 557. "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Defendant was convicted of aggravated robbery, a Class C felony. T.C.A. § 39-13-401(b). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). Aggravated robbery is defined as robbery that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1).

As pointed out by the State, the trial court in this case provided an excellent summary of the evidence at the close of the State's proof, when ruling upon Defendant's motion for judgment of acquittal:

> The [Co-] defendant, Mr. Williams, is working at this establishment, a Mapco, and prepares a deposit somewhere in the neighborhood of nine thousand dollars, and according to company policy is supposed to get that money in the safe.
>
> And from what I've heard he violated that policy. He doesn't put it in the safe. He lays it out. And then leaves it to take out the trash.
>
> He leaves the – meanwhile, he's received a series of phone calls, the first call at 10:52 from Mr. Hull [Defendant], and he goes outside to take the call. Don't know what was said.
>
> Another call and another call and another call. Another call, the fourth call, and again he walks outside. Walks out to the south side of the building.
>
> Then at 12:07, he gets a call and says it will be a few more minutes. And then, at 12:09, there's a call that says something to the effect now. I believe that's the call we just heard.
>
> And I heard something in that now that could be interpreted as being Monte. Monte. I mean, it could be interpreted as that. And he says now.
>
> Then at 12:11, there's a call trying to call Mr. Hull [Defendant]. And then, right after the robbery, the first call, even though there's not a connection, was to Mr. Hull [Defendant], even before he calls his supervisor.
>
> So, we've got some suspicious calls there.

Then, [just before the robbery] he goes out to the south side of the building and within moments of him coming back in the building, Mr. Williams, the man comes from the same side of the building. And when Mr. Williams is entering, he's looking back in that direction.

And he comes into the store and the first thing he does is get the clerk to come back to the desk to discuss some envelope – Miss Johnson to come back to discuss some envelope.

And then, the coups de grace if you want to call it that is when the robber comes in, he doesn't go to the safe, he doesn't go to the cash register, he comes in and asks where's the money, which I find highly unusual, that a Mapco is robbed and there's no money taken from the register.

No question about the safe, just where's the money.

And then, Mr. Williams is – doesn't hesitate to point out where the money is, it's almost like, if you don't see it, we want you to see it.

And then, his demeanor is calm, cool, and collected, and then he calls Mr. Hull [Defendant].

. . . .

As far as Mr. Hull [Defendant] is concerned, having found the evidence is sufficient to support the  - - a verdict against Mr. Williams, then I think his phone calls with Mr. Hull [Defendant] – and grant you, we don't have proof that Mr. Hull [Defendant] made the calls, but I think it's an inference that the calls were made by Mr. Hull [Defendant] or to Mr. Hull [Defendant].  That's what we've got right now.  Have to take it in the light most favorable to the State.

And his relationship with [Mr. Williams], as well as the tentative ID.

And what she said was this is the – on the document that was introduced into evidence, this is the guy that robbed me.

The evidence in this case is sufficient to establish Defendant's identity as the person who robbed the Mapco on February 19, 2008.  Although Ms. Johnson could not identify Defendant at trial, and she told police at the scene that she could not identify him, Ms.

Johnson picked Defendant's photograph out of a line-up shown to her by Detective Parks on May 8, 2008. Detective Parks testified that Ms. Johnson looked at the line-up for four or five seconds, pointed to Defendant's photograph, and said, "This is the guy that robbed me. This looks like him." She also circled Defendant's picture and wrote, "This is the guy that robbed me at the Mapco." This was after she had been shown a previous line-up on February 26, 2008, and she did not identify anyone.

There was testimony that Co-Defendant Williams left $9,000 laying on the counter prior to the robbery, and he distracted Ms. Johnson by asking about an envelope when Defendant walked into the store armed with a gun. Co-Defendant Williams' cell phone records showed fifteen conversations between the phone belonging to Co-Defendant Williams and the phone belonging to Defendant around the time of the robbery. The calls began at 10:52 a.m. on February 19, 2008, and ended at 6:53 p.m. There were also five attempted calls between 11:35 a.m. and 12:24 p.m. Co-Defendant Williams also dialed Defendant's phone immediately after the robbery, before pulling the silent alarm or calling the district manager. Co-Defendant Williams did not deny that he could be heard on the surveillance tape at 12:09 p.m. saying "[N]ow, now, Monte, come on now." Co-Defendant Williams also told police that a small blue car left the store parking lot immediately after the robbery traveling on Park Avenue; however, the car actually traveled the opposite direction on Airways Boulevard. From Ms. Johnson's identification and the other proof presented at trial, a reasonable juror could infer that Defendant joined Co-Defendant Williams in robbing the Mapco.

Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant's conviction for aggravated robbery. The jury heard testimony from Co-Defendant Williams and other family members concerning Defendant's alibi, and by its verdict, obviously found the testimony was not credible as was its prerogative. Defendant is not entitled to relief in this appeal.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE